# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Equal Employment Opportunity Commission,

          Plaintiff,

and

          Civ. No. 09-729 (RHK/RLE)
**MEMORANDUM OPINION AND ORDER**

James Edstrom,

          Plaintiff-Intervenor,

v.

Hibbing Taconite Company,

          Defendant.

---

Laurie A. Vasichek, Jessica A. Palmer-Denig, Equal Employment Opportunity Commission, Minneapolis, Minnesota, for Plaintiff.

Benjamin R. Elwood, Schaefer Law Firm, LLC, Minneapolis, Minnesota, for Plaintiff-Intervenor.

Donald R. Gilbert, Jessica L. Post, Fennemore Craig, PC, Phoenix, Arizona, for Defendant.

---

## INTRODUCTION

The Equal Employment Opportunity Commission ("the EEOC") and James Edstrom (collectively, "Plaintiffs"), allege that Defendant Hibbing Taconite Company ("Hibbing") unlawfully discriminated against Edstrom based upon his hearing disability.

This matter comes before the Court on Hibbing's Motion for Summary Judgment. For the reasons set forth below, the Motion will be granted in part and denied in part.

## BACKGROUND

Viewed in the light most favorable to Plaintiffs, see Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000), the events giving rise to this action are set forth below as follows.

### I. Background information on Plaintiff James Edstrom

Edstrom suffers from a severe hearing impairment. (Edstrom Dep. Tr. at 13.) He is "profoundly deaf," meaning that without a hearing aid he cannot hear anything. (Id.) He wears a hearing aid in his left ear, with which he can hear sounds and distinguish some words. (Id. at 13, 18.) Edstrom does not wear a hearing aid in his right ear because that ear cannot detect sound, even with assistive technology. (Id. at 13.)

Edstrom is trained as an automotive mechanic and welder and has held positions performing these skills. (Edstrom Decl. ¶¶ 3-4, Ex. 1.) He has also maintained a Class A driver's license, which allowed him to drive vehicles weighing over 10,000 pounds. (Id. ¶ 6.) Edstrom's hearing impairment has not prevented him from performing his duties as a mechanic and welder. (Id. ¶ 5.)

From 1992 to 2001, Edstrom worked at LTV Steel Mining Company ("LTV"), a taconite mine in Hoyt Lakes, Minnesota. (Edstrom Dep. Tr. at 125-26; Moody Dep. Tr. at 77.) He began his employment at LTV as a plant worker. (Edstrom Dep. Tr. at 41-42.)

During the first year of his employment, he was involved in a near accident in the plant when another employee operating a crane did not see him and almost collided with him. As a result, Edstrom was moved outside to work in the mine pit.  (Id. at 42-43.)  During the next nine years, he performed a variety of jobs for LTV in the mine pit such as Laborer, Service Driver, and Heavy Equipment Operator.[1]  (Id. at 43-44.)  As a Heavy Equipment Operator, he operated large cats, graders, and loaders in the outdoor mine pit. (Id. at 116-17; Edstrom Decl. Ex. 1.)  He was also trained in several production jobs such as Blaster Technician, Forklift Driver, and Service Truck Operator.  (Id.; Edstrom Dep. Tr. at 104-05.)

While working at LTV, Edstrom occasionally communicated via radio to summon co-workers and supervisors, alert co-workers of his presence, and request assistance. (Edstrom Dep. Tr. at 26, 188.)  He can hear incoming radio communications, but generally cannot decipher words.  (Id. at 62, 188, 192-93.)   He can also distinguish some alarms.  (Id. at 175.)

To accommodate his communication limitations, LTV allowed Edstrom to communicate through writing.  (Id. at 117, 196.)  In addition, the LTV foreman would communicate with him using hand signals.  (Id. 196-97.)  When operating heavy equipment around shovels, he would honk his horn to announce his presence and

---

[1] Hibbing disputes that Edstrom was employed by LTV as a Heavy Equipment Operator.  (Reply at 3 n.2.)  This factual dispute must be resolved in favor of Edstrom for purposes of summary judgment.  Graves, 229 F.3d at 723.

communicate.  (Id. at 117-18.)  While working at the mine pit at LTV, Edstrom did not

experience any safety problems.  (Bolf Dep. Tr. at 86; Moody Dep. Tr. at 113; Lerick

Dep. Tr. at 42.)  His position at LTV was terminated when LTV closed in 2001.

(Edstrom Dep. Tr. at 126.)

## II.    Entry-level positions at Hibbing

In December 2005, Edstrom applied for five entry-level positions at Hibbing.

(Edstrom Dep. Tr. at 89.)  Hibbing, like LTV, has two main areas of operation, the

outdoor mine pit and the plants, which are buildings containing the machinery to process

taconite rock.  (Palmer-Denig Decl. Ex. 5.)  Two of the entry-level positions (Production

Truck Driver and Heavy Equipment Operator) require workers to be located in the mine

pit, and the three other positions (Crusher Attendant, Separator Attendant, and Green

Feed Attendant) require workers to be located in the plants.  (Mem. in Supp. Exs. F, G,

Q.)

Production Truck Drivers transport ore and waste from the mine pit to other areas

of the mine.  (Baird Decl. ¶ 3.)  The drivers communicate with other drivers, dispatch,

and the foreman through radio.  (Id. ¶ 5.)  Heavy Equipment Operators run dozers,

graders, and loaders.  (Bolf Decl. ¶ 8.)  One important responsibility for these operators is

cleaning up debris next to the shovel,[2] which requires communication with the shovel

operator.  (Baird Decl. ¶ 7.)  The three entry-level Attendant positions require workers to

---

[2] The shovels scoop up taconite pieces and place them in trucks to be transported to other areas
of the mine.  (Palmer-Denig Decl. Ex. 5.)

be located in the plants.  (Angelo Decl. ¶ 2.)  These areas are dark, dusty, and extremely

loud.  (Id.)  All three Attendant positions require employees to monitor machinery and

equipment.  (Id. ¶ 4.)

Four of the five entry-level positions Edstrom applied for require workers to carry

a radio.[3]  (Baird Decl. ¶ 8.)   Hibbing asserts that radios are essential for both job

performance and safety at the mine.  (Id. ¶ 9.)

## III.    Edstrom's application process

Applications for the five positions were first screened by HireDesk, an online

human resources application.  (Bolf Dep. Tr. at 22-25.)  Those applications meeting

Hibbing's objective criteria were passed on to Hibbing personnel, who then further

screened them to determine which applicants would receive interviews.  (Id.)  Any new

employees hired by Hibbing are hired for a sixty-day probationary period before

receiving permanent employment.  (Moody Dep. Tr. at 66.)

After his application was screened by HireDesk and Hibbing, Edstrom was

selected for an interview, and he was so notified by letter.  (Bolf Dep. Tr. at 71; Moody

Dep. Tr. at 78.)  His wife telephoned Hibbing to accept the interview, requesting a sign-

language interpreter to assist her husband in asking and answering questions.  (Moody

Dep. Tr. at 78.)  When Hibbing realized that Edstrom was hearing impaired, it rescinded

its interview offer, believing it could not provide him a safe working environment.

---

[3] The Crusher Attendant is not required to carry a radio.  (Baird Decl. ¶ 8.)

(Moody Dep. Tr. at 82-85, 92.)  Edstrom's wife protested this decision, stating that her husband had worked safely at the LTV mine pit and was able to hear some sounds with the assistance of a hearing aid.  (Id. at 92.)  Hibbing informed her that this information would be passed on to and considered by its HR department.  (Moody Dep. Tr. at 92-93.)  After a month passed without any further communications from Hibbing, Edstrom filed a discrimination charge with the EEOC.  (Palmer-Denig Decl. Ex. 8.)  Soon after this charge was filed, Hibbing requested an interview with him, offering the assistance of a sign-language interpreter.  (Moody Dep. Tr. at 95.)

On March 16, 2006, Edstrom interviewed with Hibbing.  (Id. at 96.)  During the interview, Edstrom was asked about his experience at LTV.  (Id. at 105.)  When asked how he communicated there, he said that he received instruction through writing and hand signals.  (Edstrom Dep. Tr. at 196-97.)  He informed his interviewers that he had no safety issues when operating heavy equipment at LTV.  (Bolf Dep. Tr. at 86.)  He also stated that he preferred to work in the mine pit over the plant positions.  Specifically, he stated that it would be unsafe for him to work in the plants, and that he would need to work with a partner if placed there.  (Edstrom Dep. Tr. at 111-12; 215-16.)  He noted that he had trouble working in plants because of the noise and vibrations.  (Id. at 51-52.)

Hibbing did not ask how it could accommodate Edstrom's hearing impairment other than asking how LTV had accommodated it.  (Moody Dep. Tr. at 120-21.)  Hibbing understood that Edstrom required some kind of accommodation.  (Bolf Dep. Tr. at 102.)  He was not told during the interview that the accommodations he received at LTV were

not considered acceptable by Hibbing, and he was neither asked for nor given additional accommodation suggestions. (Edstrom Decl. ¶ 10.)

Immediately following the interview, Hibbing's interview team discussed Edstrom's ability to work at the mine and determined that he could not be hired. (Carlson Dep. Tr. at 25.) The team did not discuss alternative communication devices or accommodations. (Bolf Dep. Tr. at 99; Bryant Dep. Tr. at 59-60.) The team did not contact any business service organizations[4] to determine what accommodations may have assisted Edstrom. (Bryant Dep. Tr. at 60-64.)

After the interview, Edstrom was required to take three pre-employment tests: verbal comprehension, numerical ability, and space visualization. (Moody Dep. Tr. at 34, 122-24.) He required the assistance of an interpreter for the verbal comprehension test, but not the numerical and space-visualization tests. (Weiner Decl. ¶ 4; Compton-Conley Dep. Tr. at 178-80.) Because of his need for interpretation, he requested additional testing time, but this request was denied. (Edstrom Dep. Tr. at 200.) He received a passing score on the verbal-comprehension test, but scored poorly on the numerical and space-visualization tests. (Weiner Decl. ¶ 6.) Edstrom was not hired by Hibbing as a result of his hearing impairment. Hibbing did not consider his poor test results in making this decision. (Bolf Decl. ¶ 15**.)**

---

[4] For example, Deaf and Hard of Hearing Services is a program of the Minnesota Department of Human Services that offers assistance to employers in identifying accommodations for deaf

**IV.    The current lawsuit**

The EEOC filed the instant action in March 2009, alleging violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*  Edstrom later intervened, alleging violation of the ADA and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.*  Hibbing now moves for summary judgment on all claims.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Id. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Graves, 229 F.3d at 723; Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

---

employees and employment applicants.  (Hodek Decl. ¶¶ 1-4.)

**ANALYSIS**

Plaintiffs allege that Hibbing discriminated against Edstrom in violation of the ADA and the MHRA. The Court will assess these two claims together applying federal law, as each is analyzed under the same standards. See Philip v. Ford Motor Co., 328 F.3d 1020, 1023 n.3 (8th Cir. 2003).

Under the ADA, employers are prohibited from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA also requires employers to provide reasonable accommodations for the known limitations of an otherwise qualified employee with a disability, unless the requisite accommodation would impose an undue hardship. 42 U.S.C. § 12112(b)(5)(A).

**I.      Is Edstrom "qualified to perform the essential functions of the job"?**

"To establish a claim under the ADA, a plaintiff must show (1) that [he] is disabled within the meaning of the Act; (2) that [he] is qualified to perform the essential functions of the job either with or without accommodation; and (3) that [he] has suffered [an] adverse employment action because of the disability." Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 948 (8th Cir. 1999). Hibbing does not assert that Edstrom is not disabled or that he has not suffered an adverse employment action. Instead, it asserts that he is not protected under the ADA because he is not qualified to perform the essential functions of the positions he sought. Specifically, it asserts that no accommodation can

adequately allow him to engage in real-time, two-way communication, an essential

working requirement at Hibbing. In response, Edstrom asserts that with reasonable

accommodation, he can engage in the required communication.[5]

The parties do not dispute that real-time, two-way communication is an essential

function of the five positions Edstrom sought at Hibbing. (Mem. in Opp'n at 15-18;

Mem. in Supp. at 13-17.) Nor do the parties dispute that Edstrom requires an

accommodation to be able to engage in such communication. Accordingly, the question

is whether a reasonable accommodation exists to allow Edstrom to perform the essential

function of real-time, two-way communication. The parties hotly dispute this issue.[6]

### A. Mine pit positions: Production Truck Driver and Heavy Equipment Operator

Hibbing asserts that there is no reasonable accommodation that would allow

Edstrom to successfully participate in real-time, two-way communication while working

in the mine pit. To address this contention, Plaintiffs are "only required to make a facial

---

[5] Edstrom asserts that summary judgment should be denied in this case because there is "direct evidence" of discrimination. (Edstrom Mem. in Opp'n at 3-10.) The Court agrees that such evidence does appear in the record. In fact, Hibbing does not contest that it rescinded its offer to interview Edstrom immediately upon learning of his disability. However, the existence of direct evidence does not obviate the ADA's foundational requirement that a plaintiff be "qualified to perform the essential functions of the job." Fjellestad, 188 F.3d at 948.

[6] Hibbing has moved, pursuant to Rule 702 of the Federal Rules of Evidence, to exclude the expert report of Cynthia Compton-Conley (Doc. No. 66), who opines on the existence of several possible accommodations to assist Edstrom in working at Hibbing. (Mem. in Supp. Ex. P.) The Court determines that this Motion need not be addressed at this time because, as described in detail below, Plaintiffs have put forth sufficient evidence to create a fact issue regarding possible accommodations without relying on the Compton-Conley Report.

showing that reasonable accommodation is possible." Fjellestad, 188 F.3d at 950. Once Plaintiffs have demonstrated the existence of an accommodation that "seems reasonable on its face," U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401 (2002), the burden of production shifts to Hibbing "to show that it is unable to accommodate," Fjellestad, 188 F.3d at 950.

Whether a reasonable accommodation exists is generally a question of fact more appropriately addressed by the jury. EEOC v. Convergys Customer Mgmt. Group, Inc., 491 F.3d 790, 796 (8th Cir. 2007); see also Sch. Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 287 (1987) (noting that to decide whether a plaintiff is qualified to perform a job "the district court will need to conduct an individualized inquiry and make appropriate findings of fact").

A "reasonable accommodation" is defined in pertinent part as:

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B). Although there is no precise test for what constitutes a reasonable accommodation, "an accommodation is unreasonable if it either imposes undue financial or administrative burdens, or requires a fundamental alteration in the nature of the program." Buckles v. First Data Res., Inc., 176 F.3d 1098, 1101 (8th Cir. 1999) (internal quotation marks and citation omitted).

The Court determines that there is a genuine issue as to whether Edstrom could be reasonably accommodated for the entry-level mine pit positions at Hibbing. The evidence indicates that Edstrom operated heavy machinery at LTV for nine years and was able to communicate with co-workers and supervisors with limited radio use[7], hand signals, eye contact, horn use, and written communication.[8] The very fact that he successfully worked at the LTV mine pit is strong evidence that a reasonable accommodation could have been possible.[9] See Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc., 439 F.3d 894, 901-02 (8th Cir. 2006) (holding that evidence that the plaintiff had successfully performed the required work in the past was "sufficient for a reasonable jury to conclude [plaintiff] could perform the essential functions of the [position]"); Sprague v. United Airlines, Inc., No. Civ. A. 97-12102, 2002 WL 1803733, at *12 (D. Mass. Aug. 7, 2002) (noting that a hearing-impaired mechanic demonstrated that he was qualified for a position with

---

[7] Hibbing expert Ingrid McBride opines that Edstrom cannot communicate at all via radio. (McBride Decl. ¶ 4a.) However, Edstrom contends that he successfully utilized radio technology on a limited basis while at LTV. (Edstrom Dep. Tr. at 26, 62, 188, 192-93.) Accordingly, there is a genuine issue regarding his ability to use a radio to a certain extent.

[8] Hibbing asserts that writing notes to co-workers and supervisors would not be a reasonable accommodation because exiting heavy machinery in the mine pit to pass notes would be dangerous and time consuming. (Mem. in Supp. at 24.) Nevertheless, such note-passing occurred at LTV without incident. (Edstrom Dep. Tr. at 117.) Accordingly, a fact question exists as to whether such note passing is a reasonable accommodation at Hibbing.

[9] Hibbing asserts that LTV created a "special position" for Edstrom to employ him safely, which it is not required to do. (Mem. in Supp. at 10.) However, Edstrom contends that he was not only classified as a "Laborer" at LTV, but also as a "Heavy Equipment Operator." (Edstrom Dep. Tr. at 43-44.) Moreover, Jerry Fallos, a former LTV employee, has also stated that Edstrom worked at LTV as a Laborer and Heavy Equipment Operator. (Mem. in Supp. Ex. U.)

reasonable accommodation in part because he had successfully performed work as a mechanic with a previous employer); EEOC v. Houston Area Sheet Metal Joint Apprenticeship Comm., No. Civ. A.H.-00-3309, 2002 WL 1263893, at *8 (S.D. Tex. May 31, 2002) (finding a question of fact as to whether a hearing-impaired plaintiff could be reasonably accommodated at a sheet metal construction apprenticeship program through writing notes, gesturing, body shifting, and head nodding when such accommodations had been successful at a previous job).

While Hibbing asserts that the accommodations utilized by LTV would not work at Hibbing, a reasonable jury might conclude differently. In fact, the record demonstrates that Hibbing already communicates in some of the ways described above. For example, its 2009 General Safety Rules allow employees to establish communication through eye contact. (Palmer-Denig Decl. Ex. 12 at 47.)[10] Also, Hibbing employees will often turn off vehicle lights at night to indicate the yielding of right-of-way and will utilize hand signals to guide cranes and trucks. (Baird Dep. Tr. at 78-79, 109.) Accordingly, a jury could conclude that these simple accommodations constitute "reasonable accommodations."[11]

_____

[10] Hibbing contends that this rule was updated and its employees must now verbally communicate via radio, but that the update was mistakenly excluded from the written Safety Rules. (Bakk Dep. Tr. at 26-29.) Nevertheless, the fact that Hibbing employees were previously allowed to communicate via eye contact indicates that accommodating Edstrom by allowing non-verbal communication was possible. Hibbing cites two accident investigations indicating that a lack of radio communication causes accidents, but in both cases, it was a lack of any communication that caused the accident. (Post Decl. Ex. C.)

[11] Hibbing relies upon Southeastern Community College v. Davis, 442 U.S. 397 (1979), and

13

Because there is a genuine issue of material fact regarding the above-referenced accommodations, the Court need not address at this time whether other, more technological accommodations suggested by Plaintiffs are reasonable accommodations. For purposes of the present Motion, it is sufficient to note that it is possible that text-based devices could also assist Edstrom in communicating with co-workers and supervisors. The parties dispute whether such devices would constitute reasonable accommodations at the mine. This issue will be resolved at trial.

In sum, Plaintiffs have presented the Court with sufficient evidence to create a genuine issue whether Edstrom could have been reasonably accommodated to work in the Hibbing mine pit. Accordingly, Plaintiffs' disability discrimination claims with regard to these positions will stand.

**B.      Plant positions: Crusher Attendant, Separator Attendant, and Green Feed Attendant**

Edstrom asserts that he was also qualified to work the positions available in the Hibbing plants with reasonable accommodation. However, he informed Hibbing's interview team that he was unable to work safely in the plants. Specifically, when asked about safety, he stated that he "couldn't work inside." (Edstrom Dep. Tr. at 111-12.) This is because the plant environment is very noisy. (Id. at 52.)

---

Collins v. Gwinnett County, Georgia, 156 F. Supp. 2d 1342 (N.D. Ga. 2001), as demonstrating that hearing impairments cannot be reasonably accommodated in jobs requiring real-time, two-way communication. However, in neither case was there evidence that the disabled employee successfully performed the relevant position with a previous employer, as Edstrom did here.

By informing Hibbing that he was unable to work in the plants safely, Edstrom was acknowledging that he was not qualified for the plant positions. At the time he made this statement, he had ten years of mining experience and had worked in a mining plant where he was removed after a near accident. Accordingly, it was reasonable for Hibbing to rely on Edstrom's statement that he was unable to work the plant positions.[12] See Crain v. Bob Evans Farms, Inc., Cause No. 1:06-cv-1152, 2008 WL 906177, at *4 (S.D. Ind. Mar. 31, 2008) ("It was entirely reasonable for [the employer] to rely on [the employee's] representation [regarding] which positions he believed that he could work and with which accommodation."). Regardless of what Edstrom asserts he can do now, he does not dispute that he informed Hibbing that he could not work inside a plant safely. The Court concludes that Edstrom was not qualified to perform the essential functions of Hibbing's entry-level plant jobs. Accordingly, Plaintiffs' disability discrimination claims with regard to those positions will be dismissed.

## II. Direct threat

An employer need not hire a disabled employee if such employee poses a threat to other workers. This is called the "direct threat" affirmative defense, with "direct threat" being defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." EEOC v. Wal-Mart Stores, Inc., 477 F.3d

---

[12] The Court notes that by informing Hibbing that he could not work the plant jobs safely, Edstrom essentially withdrew his application with regard to those positions. It is well established that a plaintiff who withdraws his application cannot state a claim of discrimination. Qu v. Bd. of Regents of Univ. of Minn., Civ. No. 08-1843, 2009 WL 2900334, at *7 (D. Minn.

561, 571 (8th Cir. 2007) (internal quotation marks and citation omitted). Hibbing contends that summary judgment is appropriate here, even if there is a genuine issue regarding Edstrom's ability to perform the essential functions of the entry-level positions, because he posed a direct threat to Hibbing employees.

"The direct threat defense must be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job." Chevron U.S.A., Inc. v. Echazabal, 536 U.S. 73, 86 (2002) (internal quotation marks and citation omitted). A "slightly increased risk is not enough to constitute a direct threat, there must be a high probability of substantial harm." Dipol v. N.Y. City Transit Auth., 999 F. Supp. 309, 316 (E.D.N.Y. 1998). Factors to be considered are: "(1) the duration of risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm." Wal-Mart, 477 F.3d at 571 (internal quotation marks and citation omitted). As it is an affirmative defense, the burden lies with Hibbing to prove that Edstrom posed a direct threat to its employees. Id.

In passing fashion, Hibbing asserts that Edstrom posed a direct threat. (Mem. in Supp. at 31.) However, this argument is based upon the same factual assertions Hibbing relied upon in asserting that Edstrom is not qualified to perform the essential functions of

Sept. 2, 2009) (Kyle, J.) (citing cases).

the Hibbing positions: the inability to participate in two-way, real-time communication.[13]

As discussed in detail above, there is a genuine issue of material fact regarding Edstrom's ability to communicate when accommodated, thereby eliminating the alleged danger created by his disability. Moreover, Hibbing does not address the nature of the risk posed by him or the likelihood that any potential dangerous situation will surface. This silence is understandable, as Edstrom worked the mine pit at LTV for nine years without incident. Accordingly, summary judgment will not be granted on the basis of Hibbing's direct threat defense.

## III. The interactive process

Plaintiffs assert that Hibbing failed to engage in any "interactive process" in order to determine whether accommodations were possible for Edstrom. (Mem. in Opp'n at 18-22.) To establish a claim for failure to accommodate under the ADA, Plaintiffs must demonstrate that: (1) Hibbing knew of Edstrom's disabilities; (2) accommodations or assistance were requested; (3) Hibbing did not in good faith assist in seeking such accommodations; and (4) Edstrom could have been reasonably accommodated but for Hibbing's lack of good faith. Battle v. United Parcel Serv., Inc., 438 F.3d 856, 862-63 (8th Cir. 2006). "To determine the appropriate reasonable accommodation it may be necessary for the employer to initiate an informal, interactive process with the employee

---

[13] Hibbing also contends that Edstrom poses a direct threat because he cannot hear alarms in the mine. (Reply at 14.) However, Edstrom contends that he can hear some alarms. (Edstrom Dep. Tr. at 175.) Therefore, there is a question of fact regarding this issue that must be resolved in favor of Edstrom for purposes of summary judgment. Graves, 229 F.3d at 723.

with a disability in need of the accommodation." Fjellestad, 188 F.3d at 951 (internal

quotation marks and citation omitted).

Plaintiffs believe that summary judgment is inappropriate here, even if they have

not yet established that Edstrom is qualified to perform the essential functions of the

entry-level positions, because Hibbing did not engage in the interactive process.

However, "there is no per se liability under the ADA if an employer fails to engage in an

interactive process." Id. at 952. Nevertheless, the Eighth Circuit has held that the failure

to enter into the interactive process is prima-facie evidence of bad faith, and that when

such bad faith is present, summary judgment is not generally appropriate. Id. at 953; see

also Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 318 (3d Cir. 1999) ("When an

employee has evidence that the employer did not act in good faith in the interactive

process . . . we will not readily decide on summary judgment that accommodation was not

possible and the employer's bad faith could have no effect."). Plaintiffs assert that this is

yet another basis upon which summary judgment should be denied, and the Court agrees.

Viewing the evidence in the light most favorable to Plaintiffs, the record indicates

Hibbing's bad faith through its failure to engage in the interactive process. First and

foremost, Hibbing demonstrated bad faith when it rescinded its interview offer

immediately upon learning of Edstrom's disability. Moreover, a reasonable jury could

find that Hibbing failed to engage in the interactive process when it did not inquire into

how his disability could be accommodated, did not inform him that it believed the

accommodations he received at LTV would be insufficient at Hibbing, and did not seek

help from outside resources to find information regarding accommodations.  See

Convergys, 491 F.3d at 795 (noting that once an employer is aware of an employee's

disability and desire for accommodations, the employer "should . . . analyze the relevant

job and the specific limitations imposed by the disability and then, in consultation with

the individual, identify potential effective accommodations") (internal quotation marks

and citation omitted); EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 806 (7th Cir. 2005)

("An employer cannot sit behind a closed door and reject the employee's requests for

accommodation without explaining why the requests have been rejected or offering

alternatives."); Young v. Nicholson, No. CV-05-407, 2007 WL 128821, at *9 (E.D.

Wash. Jan. 12, 2007) (holding that the employer "utterly failed to meet its obligation to

engage in the interactive communication process" with a hearing-impaired employee

when it "failed to properly identify, utilize or bother to contact any of the resources that

were available to it in designing and implementing a reasonable accommodation").

Simply denying Edstrom's LTV accommodations and then disengaging from the process

is insufficient to satisfy the duty to participate in the interactive process.  Sears, 417 F.3d

at 806-08.  Because there is evidence of bad faith in the record, summary judgment is

inappropriate.

**IV.     Is Hibbing liable for its failure to grant Edstrom additional time to complete
         the pre-employment testing?**

The ADA prohibits employers from utilizing qualification standards that screen

out disabled individuals unless those standards are job-related and consistent with

business necessity.  42 U.S.C. § 12112(b)(6).  Here, Plaintiffs contend that Edstrom

required the reasonable accommodation of additional testing time to allow for sign-

language interpretation, and that the failure to give such time results in the screening out

of hearing-impaired applicants.  (Mem. in Opp'n at 35-38.)

Plaintiffs do not contest the fact that Edstrom passed the verbal-comprehension

test, the only test for which he needed an interpreter.[14]  It is undisputed that Hibbing did

not consider the testing results in choosing not to hire him.  Despite this fact, Plaintiffs

nevertheless assert that they maintain the ability to enjoin Hibbing's testing policies.

To support their contention that injunctive relief is appropriate here, Plaintiffs rely

on United States v. City and County of Denver, 943 F. Supp. 1304 (D. Colo. 1996).

There, the court found that in establishing a prima-facie case for an ADA "pattern and

practice" claim, the plaintiff need only show "specific evidence of company

discrimination regarding some of the employees that it seeks to represent, and that a

broad-based policy of employment discrimination existed."  Id. at 1309.  Thus, it was

held that to establish a prima-facie "pattern and practice" case, the plaintiff need not

"show individual discrimination with respect to each person for whom it seeks relief."  Id.

City and County of Denver has no application here.  First, Plaintiffs have put forth

no evidence that a "broad-based policy of employment discrimination" existed at

Hibbing.  The pre-employment testing policy is facially neutral, and there is no evidence

---

[14] Nor do Plaintiffs dispute that Edstrom did not require an interpreter to complete the numerical
ability and space visualization tests.  (Mem. in Opp'n at 36.)

that the tests have screened out *anyone* with a disability, including Edstrom.  Moreover,

City and County of Denver did require that the plaintiff demonstrate "evidence of

company discrimination regarding *some* of the employees."  Id. (emphasis added).  Here,

there is no evidence of discrimination regarding *any* employee or applicant.  Edstrom was

allowed to use an interpreter during testing, and the lack of additional time during the

verbal-comprehension exam did not cause him to receive a failing score.[15]  Accordingly,

there is simply no evidence in the record that Hibbing's testing policies screen out

disabled individuals.

In addition, Plaintiffs have put forth no evidence demonstrating a "pattern or

practice" of discrimination at Hibbing.  As the record stands, Edstrom is the only hearing-

impaired job applicant that Hibbing has encountered.  Plaintiffs cannot sustain a pattern-

and-practice claim on the basis of one incident involving one applicant.  See Supinski v.

United Parcel Serv., Inc., Civil Action No. 3:CV-06-0793, 2010 WL 569842, at *10

(M.D. Pa. Feb. 11, 2010) ("Plaintiff has simply submitted one individual hiring decision,

which is woefully inadequate for a pattern or practice of discrimination claim.").

---

[15] Plaintiffs contend that Hibbing cannot make a "bottom line" defense by asserting that the lack
of additional time did not affect Edstrom's relevant testing scores, citing Connecticut v. Teal,
457 U.S. 440 (1982).  (Mem. in Opp'n at 37.)  However, Teal is inapposite.  Teal stands for the
proposition that an employer can be held liable for racial discrimination, when there is evidence
indicating that a challenged practice has a disparate impact, even if the practice has thus far
resulted in "an appropriate racial balance."  Id. at 442.  In contrast, there is simply no evidence in
this case that Hibbing's testing policies screen out any persons with disabilities, and therefore,
there is no evidence of discrimination in the first instance.

Accordingly, Plaintiffs' claim relating to Hibbing's pre-employment testing will be dismissed.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, it is

**ORDERED** that Hibbing's Motion to Exclude (Doc. No. 66) is **DEFERRED** until trial.

Hibbing's Motion for Summary Judgment (Doc. Nos. 60 and 73) is **GRANTED IN PART** and **DENIED IN PART** as follows:

A.    Hibbing's Motion is **GRANTED** as to Plaintiffs' claims regarding its pre-employment testing policies (EEOC Compl. ¶¶ 10-12; Edstrom Compl. ¶ 12) and those claims are **DISMISSED WITH PREJUDICE**;

B.    To the extent Plaintiffs' discrimination claims relate to Hibbing's entry-level positions in the plant (EEOC Compl. ¶¶ 13-14; Edstrom Compl. ¶¶ 15-20, 22-26), Hibbing's Motion is **GRANTED** and those claims are **DISMISSED WITH PREJUDICE**; and

C.    In all other respects, Hibbing's Motion is **DENIED**.

Dated: June 2, 2010                       s/Richard H. Kyle           
                                          RICHARD H. KYLE
                                          United States District Judge